CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
8/6/2020
JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
       DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | |
|---|---|
| **TAMMY J. O/B/O H.J.,**[1] **a minor child,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 6:19–CV–00046 |
| | ) |
| **ANDREW SAUL, COMMISSIONER** | ) |
| **SOCIAL SECURITY** | ) |
| | ) |
| **Defendant.** | ) |

**REPORT AND RECOMMENDATION**

Tammy J. ("Tammy") on behalf of H.J., a minor child, filed this action challenging the final decision of the Commissioner of Social Security finding H.J. not disabled and therefore ineligible for Supplemental Security Income ("SSI") benefits under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f; R. 14. Tammy alleges that the Administrative Law Judge ("ALJ") erred by finding that H.J.'s conditions do not functionally equal a listing and by concluding that Tammy and H.J.'s allegations are not consistent with the evidence of record. I conclude that the ALJ's decision is supported by substantial evidence. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 18) and **DENYING** Tammy's Motion for Summary Judgment (Dkt. 14).

**STANDARD OF REVIEW**

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that H.J. was no longer disabled under the Act.[2] Mastro

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Under the Act, a claimant under the age of eighteen is considered "disabled" for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental

v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## **CLAIM HISTORY**

Tammy is the mother of H.J., a minor. R. 12. On June 5, 2007, H.J. was found disabled and entitled to SSI as of March 30, 2007 due to autism spectrum disorder ("ASD"). R. 97. This decision is the most recent medical determination that he was disabled, or the comparison point decision ("CPD"). R. 12–13.

Under the Act, a claimant under the age of eighteen is considered "disabled" for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The Social Security regulations provide a three–step sequential evaluation process to determine whether a minor is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the claimant is engaged in substantial gainful activity; if so, the claimant is not disabled. Id. § 416.924(a) and (b). Next, the ALJ must determine whether the claimant suffers from "an impairment or combination of impairments that is severe," and, if not, the claimant is not disabled. Id. § 416.924(a) and (c). To qualify as a

---

impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

2

severe impairment, a condition must cause more than a minimal effect on the claimant's ability to function. Id. § 416.924(c). If an impairment is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," then it is not severe. Id. If the claimant has a severe impairment, the analysis progresses to step three where the ALJ must consider whether the claimant's impairment or combination of impairments meets, medically equals, or functionally equals a listing. Id. § 416.924(a),(d). If the claimant has such an impairment, and it meets the duration requirement, the claimant is disabled. Id.

When conducting this "step three" analysis, the ALJ must consider the following six relevant domains[3] of functioning to determine whether a severe impairment functionally equals a listed condition: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well–being. 20 C.F.R. § 416.926a(b)(1). For a claimant to be found disabled, marked limitations must be assessed in at least two domains or an extreme limitation assessed in one domain. Id. § 416.926a(a). "Marked" limitation is defined as "more than moderate" but "less than extreme." Id. § 416.926a(e)(2)(i). A minor has a "marked" limitation in a domain when his impairment interferes seriously with his ability to independently initiate, sustain, or complete activities. Id. Extreme limitation is defined as "more than marked." Id. § 416.926a(e)(3)(i). While an extreme limitation is the rating given to the worst limitations, it does not necessarily require a total lack or loss of ability to function. Id.

---

[3] The domains "are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).

3

In the June 5, 2007 decision, the Commissioner determined that H.J. was disabled due to his autism spectrum disorder causing marked limitations in the functional domains of attending and completing tasks and interacting and relating with others. R. 12–16.

After the Commissioner awards SSI benefits to an individual under the age of 18 based upon "an impairment (or combination of impairments) which is likely to improve," the Commissioner must periodically conduct an evaluation to determine if the individual remains eligible for benefits. 42 U.S.C. § 1382c(a)(3)(H)(ii)(I). This process is referred to as a "continuing disability review." 20 C.F.R. § 416.989. When performing the continuing disability review, the Commissioner utilizes a three-step medical improvement review standard to ascertain whether the child's disabling condition improved since the most recent favorable decision. See 20 C.F.R. § 416.994a(a); Social Security Ruling (SSR) 05–03p (Apr. 27, 2005).

First, the Commissioner must determine whether the claimant experienced medical improvement in his disabling impairment since the comparison point decision. 20 C.F.R. § 416.994a (a)(1), (b)(1). If there has been no medical improvement, the claimant continues to be disabled, unless an exception applies. Id. Second, if the comparison point decision was made on or after January 2, 2001, and there has been medical improvement in the child's condition, the Commissioner must determine whether the impairment the claimant had at the comparison point decision now meets or medically equals the same Listing that it met or medically equaled at the time of the comparison point decision, or whether the impairment functionally equals the Listings. Id. § 416.994a(a)(1), (b)(2); SSR 05–03p. If so, the claimant continues to be disabled, unless an exception applies. 20 C.F.R. § 416.994a(a)(1), (b)(2). Third, if the child's impairment no longer meets or medically equals the same Listing that it met or equaled at the time of the comparison point decision, and does not functionally equal the Listings, the Commissioner must

determine whether the claimant is currently disabled under the three-step sequential analysis in 20 C.F.R. § 416.924 for determining whether a child is disabled in the first instance. Id. § 416.994a(a)(1), (b)(3). If not, the claimant ceases to be disabled, and benefits are terminated. Id.

On December 30, 2015, the agency determined that H.J. no longer met the disability requirements as of December 15, 2015. R. 69–72. Tammy appealed the decision on H.J.'s behalf, but it was upheld upon reconsideration. Id. On January 9, 2018, the ALJ held a video hearing during which H.J. and Tammy appeared. Id.

On July 16, 2018, the ALJ issued a decision finding H.J. no longer disabled. R. 12–29. The ALJ found that the impairments H.J. suffered from at the time of the CPD had improved and no longer met or functionally equaled the listings of impairments. R. 16. The ALJ determined that since December 30, 2015, H.J. continued to have the severe impairments of autism spectrum disorder and attention deficit hyperactive disorder ("ADHD"). R. 22. At the time of the CPD, H.J. had marked limitations in attending and completing tasks and in interacting and relating with others, but either less than marked or no limitations all other domains. R. 16–22. The ALJ found that H.J had no impairment or combination of impairments that met or medically equaled one of the listed impairments, specifically considering 112.10 (autism spectrum disorder) and 112.11 (neurodevelopmental disorders). R. 22–23.

The ALJ concluded that H.J.'s medically–determinable impairments could reasonably be expected to produce the alleged symptoms, but the statements concerning the intensity, persistence and limiting effects of H.J.'s symptoms were not entirely consistent with the objective medical and other evidence. R. 24. The ALJ then considered the limitations caused by all of H.J.'s impairments on the six domains of functioning, concluding that H.J. had a less than

marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting with others and no limitations in the domains of moving about and manipulating objects, caring for herself, and health and physical well–being. R. 27–29. The ALJ concluded that H.J.'s disability ended on December 30, 2015, and that H.J. had not become disabled again since that date. R. 29.

## ANALYSIS

Tammy challenges the ALJ's determination that H.J.'s impairments caused less than marked limitations in the domains of acquiring and using information and attending and completing tasks. Tammy also challenges the conclusion that H.J.'s allegations are not entirely consistent with the evidence of record.

### A. Testimony

At the January 9, 2018 hearing, Tammy testified. R. 42–58. Tammy discussed H.J.'s treatment for ADHD, autism disorder, and obsessive compulsive disorder ("ODD"). R. 42. Tammy claimed that H.J.'s ADHD prevented him from completing homework and described H.J.'s individualized education program ("IEP"), which includes accommodations such as taking tests in a special area. R. 44–45. Tammy described H.J. as not having recent major behavioral problems, but having had such problems in the past, including running out of class and throwing things. R. 46. Tammy testified that because of H.J.'s autism disorder, he needed reminders to maintain his personal hygiene and not to choose inappropriate clothing (though he could dress himself). R. 49–53. H.J. frequently did not understand social cues, did not make friends and did not understand more than one instruction at a time. Id. Tammy testified that H.J.'s reading comprehension was at his grade level. R. 54.

H.J. was fourteen years old at the hearing and testified that he had difficulties keeping up with homework and classwork and participating in class. R. 59–61. H.J. preferred playing video games to doing homework and had as many as eighteen friends with whom he played video games. R. 62–64.

**B. Medical Evidence**

At age three, H.J. was diagnosed with autism by multiple practitioners. On January 24, 2007, Teresa Brennan, M.D., noted behaviors consistent with autism spectrum disorder. On March 20, 2007, Dr. Brennan included in a prescription that H.J. suffered from autism spectrum disorder and behavior disorder. R. 446. On March 26, 2007, Janice Luth, M.D. at Village Family Physicians diagnosed H.D. with autism disorder as did Michael A. Sisk, M.D. at Roanoke Neurological Associates, Inc., on March 29, 2007. R. 423, 436.

Dr. Brennan has consistently treated H.J. for both his autism disorder and ADHD. On April 28, 2015, at a six–month follow–up for ADHD management, Dr. Brennan noted that H.J. was alert and cooperative with no anxiety, irritability, or restlessness. R. 339–340. Dr. Brennan diagnosed H.J. with autism spectrum disorder and increased his dosage of Vyvanse. Id. At a November 2, 2015 follow–up, Dr. Brennan provided similar objective examinations, noted H.J.'s continued ADHD, and adjusted his medication. R. 336–337. At a May 31, 2016 follow–up, Dr. Brennan noted H.J. showing improved attention, made similar objective findings except that H.J. made limited eye contact, and maintained his ADHD medication. R. 394–395. At a November 28, 2016 follow-up, Dr. Brennan described H.J. as pleasant and responsive and continued his medication. R. 543–545. At a May 16, 2017 follow–up with Dr. Brennan noted that H.J. experienced difficulty concentrating and sustaining attention and that his compliance with taking medication was only fair. R. 541–542.

### C. Educational and Accommodation Evidence

H.J. was found eligible for special education services initially in 2007 and after re–evaluation in 2009 and 2012. R. 361. A summary of a September 25, 2014 evaluation described H.J. as suffering from no sociocultural factors which would interfere with educational planning despite being identified with a pervasive developmental disorder ("PDD"), oppositional defiant disorder ("ODD"), and ADHD in 2008. Id. A summary of a January 20, 2015 psychological evaluation described H.J. as having average cognitive abilities with a weakness in successive processing abilities and struggling from executive functioning tasks, inattention, hyperactivity/impulsivity, and aggressive tendencies. Id. A summary of a January 21, 2015 educational evaluation described H.J. as demonstrating average cognitive ability with weakness in successive processing and executive functioning, taking medication for ADHD, getting diagnosed with ADS, PDD, and ODD, and having scores in the average range for most subjects but below average for written language and phonological awareness. Id.

An addendum to H.J.'s IEP for the 2015 to 2016 school year described him as a strong reader but struggling with a written expression and math problems that involve more than one step. R. 380. H.J.'s attention deficit disorder evaluation scores fell in the average range, but he exhibited problems with rushing through assignments, not maintaining attention, and not following directions. R. 381. H.J. had difficulty with directions and sometimes getting distracted, but working hard and successfully when focused. Id. It described H.J. as sometimes not looking at staff members when they talk to him but socializing well with his peers. Id.

The IEP for the 2015 to 2016 school year provided H.J. special education services for fifteen minutes five times a week for behavior, math, and language arts. R. 383–384. H.J. also received services for fifteen minutes five times every other week for social studies and science,

and (for only the second half of the school year) ninety minutes five times every other week for "resource". Id. H.J. received further accommodations including calming breaks, assistance with directions, breaking down material into manageable parts, providing extra time to complete assignments and tests, having a flexible schedule, preferential seating, copies of notes and study guides, small group testing, and taking Standards of Learning (SOL) tests with a flexible schedule, in a large group size, and with assistance with directions. R. 386–387.

A March 8, 2017, IEP for the 2017 to 2018 school year provided H.J. special education services 10 minutes every other day for consultation and support and accommodations similar to the 2015 to 2016 school year. R. 510.

A March 8, 2017 "Present Levels of Academic and Functional Performance" report described H.J. having weaknesses in areas including successive processing abilities, attention and concentration. The report further discussed that H.J. did not seek assistance when he should, that he had difficulty organizing thoughts, that he required a flexible teaching schedule and that he struggled academically in a world history course. R. 503–504. However, the report gave H.J. "average" scores in inattention and hyperactivity/impulsivity and noted, "[H.J.] has been successful in his classes with minimal support." Id. In the 2017–2018 school year, H.J. earned grades of 65.0 in Algebra 1 Part 1, 72.0 in Computer Information Systems, 74.0 in Earth Science Part 2, 61.1 in English 9, 86.0 in Health and PE 9, 75.0 in Resource, and 64.0 in World History II. R. 492.

### D. Teacher Questionnaires

On December 8, 2015, Lindsay Meredith, a Bedford Middle School counselor, completed a questionnaire. R. 342–366. She stated that H.J. had only slight problems except for one obvious problem in the domain of attending and completing tasks (in the category of focusing long

9

enough to finish assigned activity or task). Id. In a February 8, 2018 letter, Tammy claimed that neither she nor H.J. knew Ms. Meredith and that Tammy had "no idea" why Ms. Meredith filled out the questionnaire. R. 217. Tammy disagreed with Ms. Meredith's findings, claiming that they contradicted the IEP and concluding, "I feel that Hunter is still disabled; he has not been cured from the ASD, ODD nor the ADHD and still regresses back." R. 217–219.

On June 6, 2016, Jennifer Putney, Bedford Middle School English teacher, completed a questionnaire. R. 232–237. She identified in H.J. only no problems or slight problems in all categories except for obvious problems in acquiring and using information (in the categories of understanding and participating in class discussions and providing organized oral explanations and adequate descriptions), obvious problems in interacting and relating with others (in the categories of making and keeping friends, relating experiences and telling stories, and interpreting meaning of facial expression, body language, hints, sarcasm), and obvious problems in caring for himself or herself (handling frustration appropriately, being patient when necessary, and identifying and appropriately asserting emotional needs). Id.

On December 1, 2017, Linda Kennedy, a Liberty High School teacher, completed a questionnaire. R. 276–283. Ms. Kennedy identified in H.J. no problems in the areas of interacting and relating with others and moving about and manipulating objects. Id. In the area of acquiring and using information, Ms. Kennedy found two categories "not applicable" due to few class discussions occurring in her class, found H.J. to only have slight problems in most categories, and rated H.J. as having a serious problem in "[p]roviding organized oral explanations and adequate descriptions." Id. In the area of attending and completing tasks, Ms. Kennedy found H.J. to have obvious problems (in the categories of paying attention when spoken to directly, refocusing to task when necessary, carrying out multi-step instructions, and

10

completing class/homework assignments), a serious problem (focusing long enough to finish assigned activity or task), and very serious problems (working without distracting self or others and working at reasonable pace/finishing on time) that Ms. Kennedy described as occurring hourly. Id. Ms. Kennedy further noted in this section that Hunter is very easily distracted in class, needs prompting to start and continue to work on tasks until finished, and does not usually ask for assistance when needed. Id. In Caring for Himself or Herself, Ms. Kennedy found H.J. to have a serious problem with knowing when to ask for help that occurred weekly. Id.

On December 4, 2017, Crystal DeLong, H.J.'s World History II teacher at Liberty High School, completed a questionnaire. R. 284–291. Ms. DeLong identified in H.J. only no problems or slight problems all areas except for Caring for Himself and Herself, where she found H.J. to have an obvious problem in knowing when to ask for help that occurred weekly. Id.

On December 4, 2017, Lee Knighting, H.J.'s Earth Science Part II teacher at Liberty High School, completed a questionnaire. R. 292–299. Mr. Knighting identified in M.J. obvious problems in acquiring and using information (in the categories of comprehending and doing math problems, understanding and participating in class discussions, and providing organized oral explanations and adequate descriptions), but otherwise only no problems or slight problems. Id.

On December 4, 2017, Amanda King, H.J.'s Algebra I teacher at Liberty High School, completed a questionnaire. R. 300–308. Ms. King identified no greater than slight problems in all areas except for attending and completing tasks. Id. In that area, she found H.J. to have an obvious problem with completing class/homework assignments that occurred daily and an obvious problem with completing work accurately without careless mistakes that occurred weekly. Id.

11

On December 4, 2017, Jeanne Willis, H.J.'s Computer Information System teacher at Liberty High School, completed a questionnaire. R. 310–317. Ms. Willis identified no problem in any area except for attending and completing tasks, where she found H.J. to have daily obvious problems in refocusing to task when necessary, carrying out multi–step instructions, completing work accurately without careless mistakes, and working at reasonable pace/finishing on time and daily serious problems in completing class/homework assignments and working without distracting or others. Id.

The ALJ assigned some weight to these opinions and then listed H.J.'s occasional issues with difficulty maintaining attention and focus, handling frustrations, rushing through schoolwork, understanding social cues and maintaining eye contact, as well as these conditions improving with treatment. R. 26. The ALJ then described evidence of limited impairment, including signs of improvement as to attention and academics. R. 27.

**E. State Agency Medical Opinions**

On December 30, 2015, Julie Jennings, Ph.D., a psychological consultant with the Disability Determination Service, found that H.J.'s only impairment at the time of the CPD was autism spectrum disorder. R. 367–373. Dr. Jennings found that H.J.'s impairments at the time of her evaluation were ADHD and autism spectrum disorder but that they did not meet, medically equal, or functionally equal the requirements of a listed impairment. Id. Dr. Jennings found that these conditions caused A.C. to have a less than marked limitation in Attending and Completing Tasks and no limitations in all other functional domains. Id. On July 11, 2016, Howard Leizer, Ph.D., reached the same conclusions. R. 397–400.

The ALJ assigned partial weight to the opinions of the state agency consultants, finding them "balanced and objective" but that the reports were produced before records of H.J.

experiencing difficulty maintaining concentration, even if those problems improved with treatment. R. 25.

### F. Functionally Equal Listing of Impairments

Tammy challenges the ALJ's conclusion that H.J. had a less than marked limitation in acquiring and using information and a less than marked limitation in attending and completing tasks.

#### 1. Acquiring and Using Information

Tammy asserts that substantial evidence does not support the ALJ's determination that H.J. has a less than marked limitation in the domain of Acquiring and Using Information. Tammy points to teacher questionnaires, H.J.'s IEP, an academic and functional performance evaluation, and H.J.'s accommodations as contradicting the ALJ's conclusion. Pl.'s Br. at 25.

In the domain of acquiring and using information, the Commissioner considers how well a child acquires information and then uses the information learned. See 20 C.F.R. § 416.926a(g); SSR 09–3p. School-age children without impairment should be able to learn to read, write, and do math, and discuss history and science, and to use those skills both in academic and in daily living settings. Id. § 416.926a(g)(2)(iv). The child should be able to use increasingly complex language to share information and ideas with individuals or groups, ask questions, express his own ideas, and understand and respond to others' opinions. See id.

The ALJ reviewed the evidence of record which included H.J. having difficulty with math, being unable to comprehend what he reads or write a paragraph, and participating in class discussions. R. 26–27. The ALJ described that H.J. earned decent grades, including in math and reading, actively participating in groups, working independently, playing video games with others, socializing well with others, riding a bicycle, hunting, and swimming. Id.

Substantial evidence supports the ALJ's determination that H.J. has a less than marked limitation in acquiring and using information. The ALJ reviewed the evidence, drew from a variety of records, and explained how he reached his conclusion. As the ALJ noted, H.J. showed improvement in 2017, earning Ds in one class but As, Bs, or Cs in all others. R. 503. An academic and functional report during the 2017 school year noted, "[H.J.] has been successful in all of his classes consistently throughout the year with his supports." Id. The ALJ also referenced H.J. socializing (See R. 345, 504) and sharing information with other people in groups and assigned partial weight to the opinion of state consultative examiners, who both found that H.J. "actively engages in group work." R. 372, 402. The ALJ also cited H.J. working independently and able to identify mistakes when he went back to revisit his work. R. 302.

Tammy alleges that the ALJ failed to explain his reasons for assigning "some weight" to the opinions of H.J.'s teachers or why he relied on their findings in some instances but not in others. Pl.'s Brief at 23. The regulations applicable to a claim for child's supplemental security income benefits recognize that school records, including reports from teachers, are "important sources of information" regarding a claimant's impairment(s) and its effects on his ability to function. 20 C.F.R. § 416.924a(b)(7). The regulations provide that, if you go to school, "we will ask your teacher(s) about your performance in your activities throughout your school day," and "[w]e will consider all the evidence we receive from your school, including teacher questionnaires..." Id. See Tameisha M. o.b.o. T.M. v. Berryhill, 340 F. Supp. 3d 573, 578 (W.D. Va. 2018).

Here, the ALJ properly considered the questionnaires from H.J.'s teachers and school counselor, who, in this domain, overwhelmingly found no problems and slight problems, only infrequently found obvious problems, only once found a serious problem, and never found a very

14

serious problem. R. 232–351. The ALJ cited to specific findings by the teachers and considered them throughout his opinion. The ALJ provided an explanation for the conclusions reached and I find that substantial evidence supports the finding that H.J. has a less than marked impairment in the domain of acquiring and using information.

### 2. Attending and Completing Tasks

Tammy asserts that substantial evidence does not support the ALJ's determination that H.J. has less than marked limitations in the domain of attending and completing tasks. Pl.'s Brief at 25–29. Tammy points to evidence of teacher's reporting problems in this area, alleges that the record does not actually support improvement in this area through medication, claims that the ALJ ignored H.J.'s accommodations, and argues that the ALJ overlooked evidence of H.J. only performing at an average level by comparison to students in special education rather than students more broadly. Id.

In this domain, the Commissioner considers how well a child focuses and maintains his attention, and how well he begins, carries through, and finishes his activities. 20 C.F.R. § 416.926a(h). A school–age child should be able to focus his attention in a variety of situations in order to follow directions and complete assignments. Id. § 416.926a(h)(2)(iv). A child without impairment should be able to concentrate on details, change activities without distracting himself or others, and stay on task. Id.

The ALJ reviewed the evidence of record and explained H.J.'s impairments in this area, which included evidence that H.J.'s ability to maintain attention improved with medication. R. 27. The ALJ also described H.K. as having average grades, that he achieved success in classes, and that both state agency consultants found that that H.J. had a less than marked limitation in this domain. R. 27–28.

15

Substantial evidence supports the ALJ's determination that H.J. has a less than marked limitation in attending and completing tasks. The ALJ described H.J.'s difficulties in this area but noted that medication improved his ability to focus and complete tasks, that he earned average grades that ranged from A's to D's, that the 2017 IEP showed that he was successful in all classes, and that Ms. King found that he did well maintaining focus with his classwork compared with his peers. R. 27. The record supports these conclusions. For example, on November 2, 2015, Dr. Brennan found that "[o]verall, [H.J.] is doing well" and "[s]chool performance doing well overall" while H.J. was complying with his medication. R. 336. Report cards reflecting H.J.'s achievement in school support a less than marked limitation in this domain as well. R. 355, 503. Finally, the 2017 IEP showed that H.J. had average hyperactivity/impulsivity and inattention. R. 503.

Further, Ms. King found that, "[c]ompared with his peers, [H.J.] does well in maintaining focus to his classwork despite his ADHD diagnosis." R. 308. The ALJ acknowledged Ms. Kennedy's identification of serious and very serious issues in this domain but went on to explain the other evidence that he found more persuasive. R. 27. Indeed, Ms. Kennedy's opinions in this area are an outlier compared to the findings of the other five teachers and the counselor who completed questionnaires. Also, the ALJ relied upon the opinion of Ms. King, who identified "no problem" in both areas (working without distracting self or others and working at reasonable pace/finishing on time) in contrast to Ms. Kennedy who identified a "very serious problem". Compare R. 303 with R. 278. Ms. King's assessment of H.J.'s limitations were consistent with the evidence of record. Contrary to Tammy's argument that Ms. King's observations are H.J.'s performance compared only to other special education students, Ms. King never states that this is

16

the case, and the scores she provided correspond to a rating key that begins, "[c]ompared to the functioning of same–aged children without impairments…" R. 303, 308.

Last, the ALJ assigned partial weight to the state agency opinions which found H.J. to have a less than marked limitation in attending and completing tasks. The ALJ explained how the evidence supported his conclusion.

For these reasons, I find the ALJ's built a logical bridge between the evidence and his conclusion that H.J. has a less than marked impairment in the domain of attending and completing tasks, which is supported by substantial evidence.

### 3. Consistency of H.J.'s Allegations with the Record

Tammy argues that substantial evidence does not support the ALJ's finding that H.J.'s allegations are not entirely consistent with the evidence of record and that the ALJ failed to assess her own allegations.

The ALJ follows a two–step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16–3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16–3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[4] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the

---

[4] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

17

claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

The ALJ must resolve any inconsistencies between a claimant's alleged disabilities and the evidence in the record. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). If a claimant's statements are inconsistent with other evidence, the ALJ may find them less than fully credible and weight them accordingly. See SSR 96–4P, (July 2, 1996); SSR 96–7P, (July 2, 1996).

The ALJ held that while H.J.'s medically–determinable impairments could reasonably be expected to produce the alleged symptoms, H.J.'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. R. 24. The ALJ described in detail evidence that corresponded with H.J.'s purported impairments. Id. Then, however, the ALJ recounted evidence of H.J.'s concentration and ability to complete tasks improving with medication, H.J. experiencing no extended hospitalizations, and H.J. earning average grades and improving academically. R. 25. The ALJ also pointed to mental examinations finding H.J. cooperative, engaging, and without anxiety aside from isolated instances of acting reserved and making limited eye contact. Id. The ALJ also cited evidence of H.J. working hard in class and well with peers, as well as enjoying recreational activities such as hunting, fishing and playing interactive games with other people. Id.

Substantial evidence supports the ALJ's conclusion that H.J.'s statements concerning the intensity, persistence and limiting effects are not entirely consistent with the record. The ALJ thoroughly addressed the record and validly concluded that the evidence of limited impairment outweighed the evidence that aligned with H.J.'s descriptions of the impacts of his symptoms. And, contrary to Tammy's argument that the ALJ failed to evaluate Tammy's subjective allegations, the ALJ included her opinion in his evaluation of the evidence as to both contested domains, ultimately finding her statements outweighed by the evidence of less than marked impairment. R. 32–33. Further, H.J. testified about his conditions. R. 59–65. Tammy makes no argument and the ALJ made no holding that H.J. could not adequately describe his symptoms. See 20 C.F.R. § 416.928(a) (applicable to Social Security disability claims filed prior to March 27, 2017) (requiring the ALJ to evaluate a caretaker's testimony "[i]f the claimant is a child who does not describe, or cannot adequately describe, his symptoms."). Even if the ALJ had fully discounted the opinion of Counselor Lindsay Meredith, as Tammy suggests, the remaining opinions would provide substantial support for his conclusions. See R. 217–219.

A reviewing court gives great weight to the ALJ's assessment of a claimant's statements and should not interfere with it where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–990 (4th Cir. 1984). The ALJ's evaluation of H.J.'s subjective complaints provides a logical bridge from the evidence to his conclusion. Accordingly, substantial evidence supports the ALJ's assessment and should not be disturbed.

## **CONCLUSION**

Tammy, H.J.'s mother, brought this action seeking benefits for H.J. based upon continuing disability caused by his ASD, ODD, and ADHD. R. 96. The Commissioner does not contend that H.J. has no deficits, but maintains that substantial evidence supports the ALJ's

conclusion that H.J. does not have impairment or combination of impairments that functionally equals the severity of the listings. I will not reweigh the evidence where, as here, the ALJ has considered the evidence of record and explained in detail the basis for the decision. For the foregoing reasons, I **RECOMMEND** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the Commissioner, **DENYING** H.J.'s motion for summary judgment and **DISMISSING** this case from the Court's docket.

The Clerk is directed to transmit the record in this case to Norman K. Moon, Senior United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation which must be filed within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including a waiver of the right to appeal.

Enter: August 6, 2020

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge